IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ROYAL PLUS, INC.,** | * | |
| **Plaintiff,** | * | |
| v. | * | Civ. No. JKB-23-2700 |
| **LANDMARK RECOVERY OF MARYLAND, LLC,** | * | |
| | * | |
| **Defendant.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

Royal Plus, Inc. ("Royal") sued Landmark Recovery of Maryland, LLC ("Landmark") on various state-law claims arising out of Landmark's nonpayment for water-damage abatement services that Royal provided. (*See* ECF No. 1.) Now before the Court is Royal's Motion for Partial Summary Judgment. (*See* ECF No. 37.) The Motion is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2023).

For the reasons set forth below, the Motion will be denied. A separate order will issue to effectuate this decision.

**I.   BACKGROUND**

   **A.   Factual Background**

Royal is a disaster-cleanup company based and incorporated in Maryland. (ECF No. 1 at ¶ 1.) Landmark is a substance-abuse treatment provider based in Tennessee and incorporated in Delaware. (*Id.* at ¶ 2; ECF No. 7 at 1; ECF No. 37-1 at 1.) At all relevant times, Landmark was a tenant of a multistory property located at 3855 Green Spring Avenue, Baltimore, MD 21211 ("Property"). (*See* ECF No. 37-1 at 1; ECF No. 43 at 1; ECF No. 37-2 at ¶ 2.)

In late December 2022, extreme cold temperatures caused water pipes and sprinkler heads in the attic of the Property to freeze, then burst. (ECF No. 37-1 at 1; ECF No. 43 at 1–2.) The Property sustained significant water damage. (ECF No. 37-1 at 1–2; *see* ECF No. 43 at 1–2.) Landmark soon approached Royal about remediation services. (*Id.*; ECF No. 37-2 at ¶ 3.)

On December 27, the parties entered a written contract. (ECF No. 37-3 at 2.) Royal agreed to perform remediation services on a time-and-materials basis, whereby Landmark would reimburse Royal for all labor and supplies "necessary to mitigate the property damage in accordance with industry standards." (*See id.*; *see also id.* at 4 (promising to "[t]ak[e] specific action, in accordance with recognized professional standards, to reduce and attempt to eliminate the impacts and risks of a specified hazard or hazards").) The parties determined that Royal's work "may include," among other things, the removal of water and debris, the application of deodorizers and antimicrobial agents, the drying of the structure's interior, the demolition and removal of "Irreparably Damaged Building Material," and the purchase and use of "Other Services & Equipment known to be needed at time of loss." (*Id.*) They also agreed Royal could hire third-party laborers, and even subcontract entire services out to third-party vendors. (*Id.*) An addendum set the rates at which Royal would be compensated, listing hourly rates for labor, (*id.* at 11), unit rates for consumables, (*id.* at 12–17), time-based rates for equipment, (*id.* at 18–25), and either time- or distance-based rates for vehicles, (*id.* at 25–27). (*See id.* at 6–7.)

For payment, Royal could choose whether to bill Landmark through unscheduled, periodic invoices; through a single invoice stating the total amount due; or according to a preset "Draw Schedule." (ECF No. 37-3 at 3.) If Landmark disputed any of the charges, it was required, within fifteen days of receipt, to identify in writing "the disputed items and the nature of the dispute." (*Id.*) Otherwise, it was required to pay "**for any/all undisputed items within fifteen (15) days of invoicing, or within five (5) days of the Draw due date.**" (*Id.* (emphasis in original).) "Draws

2

not paid when due, or Invoices not paid[] within fifteen (15) days of due date[,]" would accrue interest "at the rate of 1.5% per month . . . or the maximum allowed by law, if different from the rate stated herein." (*Id.*)

The contract also addressed Landmark's obligations vis-à-vis insurance. In particular, the contract stated that "**payment [to Royal] is not dependent in any way on insurance coverage for the loss . . . or the receipt of insurance payment**" by Landmark. (ECF No. 37-3 at 3 (emphasis in original).) To the extent Landmark had insurance "that may cover all or part of" the contracted work, Landmark "authorize[d] and direct[ed] [its] insurance company to make payment directly to [Royal] for said work," and "assign[ed] and transfer[ed] to [Royal] all right to collect and receive payment for the work from said insurance company." (*Id.* at 3–4.) Landmark also promised "to endorse to [Royal] any insurance checks issued for said work promptly upon receipt of such insurance check," acknowledging that failure to do so "within ten (10) days of receipt [would] constitute a default." (*Id.* at 4.) And if "any insurance payment made on [Landmark's] behalf fail[ed] to satisfy the obligation owed [Royal] in full," Landmark agreed to be responsible "for any balance due." (*Id.*)

Royal first visited the Property on December 27, 2022, the same day the parties executed the contract. (*See* ECF No. 37-4 at ¶¶ 6–9.) Exposed wiring and running water prevented Royal from beginning its work in earnest until December 31. (*See id.* at ¶¶ 7–9.)

Royal soon retained an industrial hygienist to inspect the Property and determine the proper scope of remediation. (ECF No. 37-4 at ¶¶ 10–11.) On January 5, based on the hygienist's initial assessment, Royal provided Landmark with a remediation cost estimate of "between $5.5 million and $6 million," with "$6M being worst case scenario." (*See id.* at ¶¶ 11–12; ECF No. 37-5 at 1.) Four days later, on January 9, the hygienist provided Royal with a "formal" assessment report and remediation protocol. (ECF No. 37-4 at ¶ 13; *see generally* ECF No. 37-6.) It is unclear whether

Royal shared the contents of this "formal" report with Landmark, although the report does not appear to have prompted Royal to adjust its initial price quote. (*See* ECF No. 37-4 at ¶¶ 12–15.)

A short time later, Royal began to perform what it described as "approved demolition and removal of water-damaged building materials and personal property." (*See* ECF No. 37-4 at ¶¶ 14, 17.) Because Royal was awaiting "further guidance from Landmark's insurance adjuster/consultants"—in particular, a separate remediation protocol prepared by Landmark's insurer's hygienist, (*see* ECF No. 43-1 at 21–22)—Royal's default course was to follow the protocol from its *own* hygienist. (*See* ECF No. 37-4 at ¶¶ 14, 17.)

The record is unclear on when Royal received Landmark's insurer's hygienist's protocol. Royal claims it repeatedly asked for the protocol over several weeks, only to receive one "[o]n January 20, 2023, approximately one week before [Royal] completed its work." (ECF No. 37-4 at ¶¶ 17–18; *see also* ECF No. 43-1 at 22.) Landmark seems to reject this claim, asserting there were "multiple e-mails and directions and instances" of communication between the parties and their consultants "ten days to two weeks" before Royal's work concluded. (ECF No. 43-1 at 21–22.) And while the record does indicate Landmark's insurer's hygienist emailed its protocol to Royal the evening of January 13, followed by an updated copy the next morning, (ECF No. 37-7 at 1), Royal says the emails "had erroneously been sent to someone else at [Royal] who was not involved with the work at the property," and thus did not make it to the relevant Royal employees until January 20. (*See id.*; ECF No. 37-4 at ¶ 18.)

The record also indicates that, before receiving Landmark's insurer's hygienist's protocol, Royal was "advised" that it "was not being directed to remove wet exterior sheathing uncovered during the removal of damaged walls," as that work would be done later as part of Landmark's effort to convert the Property to a different use. (*See* ECF No. 37-4 at ¶¶ 13–15, 18.) Royal subsequently "agreed to reduce the mitigation cost estimate down to between $4,000,000 and

4

$5,000,000." (*Id.* at ¶ 15.) It is unclear how and by whom Royal was "advised" on this issue, and how and when Royal shared the new estimate with Landmark. (*See id.* at ¶¶ 13–15.)

As the work progressed, Royal "discovered and documented significant fungal growth within [the Property's] wall cavities." (ECF No. 37-4 at ¶ 16.) The parties offer incomplete and inconsistent accounts of what happened next. Landmark suggests Royal erred by cleaning and drying materials that ought to have been removed, and marking for removal materials that ought to have been cleaned and dried. (ECF No. 43 at 2.) Royal's account provides little additional clarity, as Royal's hygienist's protocol—which, again, Royal followed until receiving Landmark's insurer's hygienist's protocol, (*see* ECF No. 37-4 at ¶¶ 17–18)—required blighted surfaces to be either cleaned *or* removed, depending on the nature of the material on which fungal growth was detected. (*See* ECF No. 37-6 at 57–58.) Adding to the confusion are Royal's indications that it had already been directed to leave the exterior sheathing alone, despite any contrary protocol, (*see* ECF No. 37-4 at ¶¶ 14–16), and that, around January 20, Landmark "confirmed that [Royal] could dry and encapsulate the mold on the exterior sheathing[,] rather than removing such sheathing," (*id.* at ¶ 19), which leaves uncertain what Royal was doing *before* such "confirm[ation]."

The parties also offer vague and competing accounts of their communications during this period. Again, Landmark asserts there were "multiple e-mails and directions and instances" of communication between the parties and their consultants "ten days to two weeks" before Royal's work concluded. (ECF No. 43-1 at 21–22.) In Landmark's view, these interactions aimed to "augment" Royal's understanding "of what industry standard was" for the remediation project, but simply "fell on deaf ears." (*Id.*) This appears to conflict with Royal's assertion that "[d]uring the performance of the work, Landmark directed [Royal] not to have any direct communications with Landmark's insurance adjuster [or] consultants." (ECF No. 37-4 at ¶ 27.) It is also difficult to

square with other statements by Landmark itself, which suggest Landmark and its consultants did *not* closely monitor Royal's performance. (*See* ECF No. 43-1 at 21.)

Whatever happened in the interim, on February 7, 2023, Royal sent Landmark a bill for roughly $3.552 million. (ECF Nos. 37-4 at ¶ 21; 37-8.) Landmark neither paid nor "advise[d] [Royal] in writing of any dispute" within the contractual fifteen-day period. (ECF No. 37-4 at ¶¶ 22–23.) By mid-June of that year, Royal had retained counsel to facilitate mediation between the parties, as required by their contract. (*Id.* at ¶ 23; *see also* ECF No. 37-3 at 5; ECF Nos. 9–11.) Landmark "failed to respond in any way" to Royal's communications. (ECF No. 37-4 at ¶ 24.) On July 5, Royal "noted some discrepancies" in its earlier billing and sent Landmark a revised invoice for approximately $3.383 million. (*Id.* at ¶ 25; ECF No. 37-12 at 2.) But Landmark again did not pay.[1] (ECF No. 37-4 at ¶ 26.)

Landmark claims it did not pay because it "has not received anything that reflects a proper amount due"—an argument it says is supported by its insurance carrier as well as "multiple [other] third parties." (ECF No. 43-1 at 24.) In essence, Landmark argues Royal diverged from industry standards with respect to both labor and equipment. (*See* ECF No. 43-2 at 6–7 (third-party report stating Royal's bill "does not align with industry expectations from a project standpoint for the scope and magnitude of [Royal]/related efforts," and suggesting Royal sought to remove "many building components and materials found to be in good condition").) In Landmark's view, this divergence was so great that the only way to explain it was "fraudulent activity." (ECF No. 43-1

---

[1] The record is unclear as to whether Landmark timely disputed these revised charges. Royal notes only that "Landmark failed to pay the revised invoice," with no additional comment on whether Landmark disputed it timely, or at all. (ECF No. 37-4 at ¶ 26.) Landmark likewise adduces no evidence of disputing any of the "multiple invoices over multiple weeks that kept climbing in value" it claims to have received, (ECF No. 43-1 at 20), much less the two specific invoices Royal describes. For example, when asked whether Landmark timely disputed the initial invoice, Landmark's corporate deponent said he was "not sure how to answer that question," as there were "multiple invoices Landmark received." (*Id.*) And when asked instead whether he had "any knowledge of any writing from Landmark prior to this litigation disputing . . . *any* invoice submitted by Royal," he responded essentially the same way. (*See id.* at 21 (emphasis added).)

at 28–29; *see also id.* at 28 (accusing Royal of "piling on and churning" the bill); *id.* at 37–41).) Insofar as Royal pointed to its own hygienist's protocol as industry standard (and thus a sound basis for its billing), Landmark describes a remediation firm hiring its own hygienist as "an anomaly" within the trade. (*Id.* at 23–24; *see also id.* at 28 (dismissing Royal's hygienist as "bought and paid for").) And when asked about the final bill being millions of dollars lower than Royal's initial estimates, Landmark states simply that "inflated" estimates are "not uncommon" in the remediation business, as "the game is that the [insurance] adjuster . . . is going to come in . . . and whack a certain percentage off of what was presented." (*Id.* at 21.)

Royal suggests the third parties' negative assessment was based on a blinkered view of the facts, given that Landmark forbade Royal from communicating directly with the insurer and its consultants while the work was underway. (*See* ECF No. 37-4 at ¶¶ 27–30.) Once Landmark lifted the communications ban, Royal says, it became clear Landmark "had not provided the insurance adjuster with much of the back-up documentation that [Royal] had provided in support of its invoice." (*Id.* at ¶¶ 28–29.) And once the adjuster had received that documentation from Royal itself, the adjuster "acknowledged that [Royal] ha[d] validated" roughly $2.045 million of its final invoice (for $3.383 million). (*Id.* at ¶ 30.) Yet for its part, Landmark asserts it forwarded Royal's invoices promptly, and exactly as Royal had provided them—supporting documents and all. (ECF No. 43-1 at 36.)

In any event, Royal notes Landmark has not paid even the purportedly "undisputed" part of the invoice. (ECF No. 37-1 at 3; *accord* ECF No. 37-4 at ¶ 31.) In response, Landmark insists it is not bound by its insurer's valuation, aspects of which it claims the insurer disputed "at nearly every turn." (*See* ECF No. 43 at 3–4.)

The record also indicates that a Landmark-affiliated entity received insurance proceeds worth $10 million for winter-storm damage incurred at multiple Landmark-affiliated locations,

including the Property. (*See* ECF No. 37-13 at 1–2; *see also* ECF No. 37-2 at ¶¶ 24–26.) It is unclear what portion of that payout concerned damage to the Property and/or Royal's remediation work on the same. (*See* ECF No. 37-13 at 1–3; ECF No. 37-2 at ¶¶ 25–27.) Nor is it clear the extent to which Landmark itself received or otherwise had control over those funds. (*See* ECF No. 43 at 3, 14 (stating that Landmark received no insurance payout); ECF No. 43-1 at 34 (same).) What is clear, however, is that neither Landmark nor any affiliated entity forwarded proceeds to Royal. (ECF No. 37-2 at ¶ 28 (citing ECF No. 37-4 at ¶ 26); *see also* ECF No. 43-1 at 34–35.)

### B. Procedural History

On October 5, 2023, Royal initiated this suit. (ECF No. 1.) It stated two claims: one for breach of contract, (*id.* at 3–4), the other for a violation of Maryland's prompt-payment statute concerning construction agreements,[2] (*id.* at 4–5). The complaint seeks damages in the full invoiced amount of roughly $3.383 million. (*Id.* at 4–5.)

On July 31, 2024, Royal moved for summary judgment on the breach of contract claim only. (ECF No. 37.) In that Motion, Royal reasserts its request for $3.383 million in damages. (*See* ECF No. 37-1 at 3, 5.) In the alternative, it asks for damages of approximately $2.045 million, the amount it says is "undisputed by Landmark's own insurance adjustor." (*Id.* at 2–3.)

## II. LEGAL STANDARD

To earn summary judgment, the moving party must articulate a legally valid claim for relief and show "no genuine dispute as to any material fact" in support of that claim. *See* Fed. R. Civ. P. 56(a). The nonmoving party must then respond by "set[ting] forth specific facts showing that there [remains] a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003). At each stage, the Court views the facts and draws reasonable inferences in the light most favorable

---

[2] *See generally* Md. Code Ann., Real Prop. §§ 9-301 to -305.

to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). If the Court determines a reasonable jury could find in that party's favor, summary judgment will be denied. *See Anderson*, 477 U.S. at 248. But the nonmoving party cannot rest on mere denials. It must set out its own specific facts showing a genuine dispute. *Bouchat*, 346 F.3d at 525 (citation omitted). This requires more than a "scintilla of evidence." *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

Summary judgment will be denied. Royal has made out a *prima facie* case for breach of contract under Maryland law.[3] But Landmark has shown that triable issues remain.

#### A. Royal Has Met Its Initial Burden of Stating a Valid Claim for Breach of Contract and Demonstrating the Absence of Genuine Issues for Trial.

To make a *prima facie* case for breach of contract under Maryland law, a plaintiff must prove both the existence and the material breach of a contractual duty. *RRC Ne., LLC v. BAA Md., Inc.*, 994 A.2d 430, 442 (Md. 2010) (citation omitted). A breach is material when it makes further performance of the contract "different in substance from that which was contracted for." *Barufaldi v. Ocean City, Chamber of Comm., Inc.*, 7 A.3d 643, 656 (Md. Ct. Spec. App. 2010) (citation omitted). Materiality is ordinarily a question of fact, although "[t]here are instances . . . when the issue is so clear that it may be decided as a matter of law." *Id.* at 656–57.

Royal offers two distinct theories of breach. First, it argues Landmark breached by failing to pay Royal before the contractual deadline (or, for that matter, at all). (ECF No. 37-1 at 3.)

---

[3] The Court applies Maryland law to the parties' dispute. Here, the parties chose Maryland law to govern their contract. (ECF No. 37-3 at 2.) A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Perini/Tompkins Joint Venture v. Ace Amer. Ins. Co.*, 738 F.3d 95, 100 (4th Cir. 2013). In Maryland, courts that encounter a contractual choice-of-law provision "apply generally the law of the specified jurisdiction," *Cunningham v. Feinberg*, 107 A.3d 1194, 1204 (Md. 2015), disregarding the parties' chosen forum only if it bears "no substantial relationship to the parties or the transaction" or else holds a "strong fundamental public policy" against contractual choices of law in general, *Amer. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 659 A.2d 1295, 1301 (Md. 1995). In this case, Maryland bears a substantial relationship to the parties and the transaction, being both the place of the contract's performance as well as Royal's corporate home and base of operations. (*See* ECF No. 37-3 at 2; ECF No. 1 at ¶ 1.) And again, far from having a strong public policy *against* contractual choices of law, Maryland generally honors them. *See Cunningham*, 107 A.3d at 1204; *Amer. Motorists*, 659 A.2d at 103.

Second, it argues Landmark breached by retaining insurance proceeds for the damage it hired Royal to remediate, contrary to a provision forwarding those proceeds to Royal. (*See id.* at 3, 6.)

On the first theory, but not the second, Royal has met its burden of articulating a *prima facie* case and showing an absence of triable issues. The Court addresses each theory in turn.

    1.    <u>Royal Has Shown that Landmark Breached by Failing to Pay Royal within Fifteen Days of Invoicing.</u>

Royal has shown the existence of a contractual duty for Landmark to pay Royal's invoices within fifteen days. As Royal argues, (*see* ECF No. 37-1 at 5–6), this element begins and ends with the language of the parties' contract. Under Maryland law, "when the language of [a] contract is plain and unambiguous[,] there is no room for construction, and a court must presume that the parties meant what they expressed." *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985). Here, the contract plainly obliges Landmark, within fifteen days of receiving an invoice, to "**make all payments ... for any/all undisputed items.**" (ECF No. 37-3 at 3 (emphasis in original).) Landmark offers no argument to the contrary. (*See* ECF No. 43 at 3, 14.) Accordingly, to the extent any "undisputed" charges existed, Landmark owed a duty to pay them within fifteen days.

Royal has also shown a material breach of that duty. "[C]ourts applying Maryland law have routinely found that failure to pay constitutes a material breach in a wide array of contracts." *Ezzat v. AmeriGas Propane, L.P.*, Civ. No. EA-22-2918, 2024 WL 4169974, at *6 (D. Md. Sept. 12, 2024) (collecting cases). Indeed, where a contract's entire purpose is to structure the exchange of services for payment, "it strains credulity to suggest that failure to make timely payment does not constitute a failure to satisfy the terms and conditions of the agreement, particularly when the customer's obligation to promptly pay invoices appears in [multiple] places in the contract." *See id.* Royal adduces evidence that, on February 7, 2023, it billed Landmark roughly $3.552 million for remediation services, (ECF Nos. 37-4 at ¶ 21; 37-8), which Landmark neither disputed nor paid

10

within fifteen days, (*see* ECF Nos. 37-4 at ¶¶ 22–23; 37-9; 37-10; 37-11). Royal also adduces evidence that, on July 5, 2023, it issued Landmark a revised invoice for roughly $3.383 million, (ECF Nos. 37-4 at ¶ 25; 37-12 at 2), which Landmark again did not pay within fifteen days,[4] (ECF No. 37-4 at ¶ 26). Landmark does not dispute these allegations. (*See* ECF No. 43 at 3, 14; ECF No. 43-1 at 24–25, 34.) As a result, Royal has shown that Landmark's failure to dispute or pay at least the first invoice, if not also the second, was a material breach of its contractual duty.[5]

        2.       <u>Royal Has Not Shown that Landmark Breached by Failing to Forward Insurance Proceeds Contractually Owed to Royal.</u>

Royal has also shown the existence of a contractual duty for Landmark to transfer certain insurance proceeds to Royal within ten days. As above, when a contract's language is "plain and unambiguous," the Court "presume[s] that the parties meant what they expressed." *See Gen. Motors Acceptance Corp.*, 492 A.2d at 1310. And here, the parties' language is clear: to the extent Landmark had "hazard and/or other insurance . . . that may cover all or part" of the contracted work, it agreed "to endorse to [Royal] any insurance checks issued for said work promptly upon receipt of such insurance check," acknowledging that failure to do so "within ten (10) days of receipt [would] constitute a default." (ECF No. 37-3 at 4.) Again, Landmark offers no argument to the contrary. (*See* ECF No. 43 at 3, 14.) Landmark thus owed a duty to pay Royal within ten days of receiving any proceeds for storm damage that Royal had been contracted to remediate.

---

[4] As noted above, the record and briefing are silent on whether (and, if so, when) Landmark disputed this second (revised) invoice. *See supra* note 1. Had it timely done so, its obligation to pay may not have materialized. (*See* ECF No. 37-3 at 3.) Still, even assuming this uncertain fact in the light most favorable to Landmark, as the Court must, *see Aleman v. City of Charlotte*, 80 F.4th 264, 283–84 (4th Cir. 2023), Royal has shown that Landmark neither disputed nor paid the *first* invoice, which is enough for Royal's *prima facie* case.

[5] For good measure, Royal asserts Landmark "waived its right to dispute" this untimely-payment theory by "failing to raise any timely objection" to the underlying invoice. (ECF No. 37-1 at 3, 5–6.) This is unpersuasive. Whatever obligation Landmark had to object to the invoice within a certain time, Royal has given the Court no reason to believe Landmark somehow "waived" its right to object to Royal's assertions in court. That a charge be "undisputed" appears, at most, to be a condition precedent to Landmark's duty to pay within fifteen days. *See All State Home Mortg., Inc. v. Daniel*, 977 A.2d 438, 447 (Md. Ct. Spec. App. 2009). Landmark does not contest the existence of this duty. (*See* ECF No. 43 at 3, 14.) Rather, as will be discussed further below, it argues only that it is excused from *performing* that duty. *See* (*id.* at 14); *infra* Section III.B.

Yet Royal has not shown an absence of triable issues as to whether Landmark breached this duty. Royal argues Landmark received insurance proceeds but did not pass them along. (*See* ECF No. 37-1 at 3, 6; ECF No. 37-2 at ¶¶ 24–26; ECF No. 44 at 2.) In support of this, Royal points to an email indicating that a Landmark-affiliated entity received $10 million in insurance proceeds for winter-storm damage across multiple Landmark-affiliated locations. (*See* ECF No. 37-13 at 1–2.) But Landmark describes this payout as deriving from "an umbrella policy" that covers "at least 23 different unique properties." (ECF No. 43-1 at 34.) As Landmark explains, the policyholder (and beneficiary) is not Landmark itself, but Landmark's parent company. (*See id.*) Although the record suggests Landmark could in some way "draw on" those funds, (*see id.*), and even shows that a Landmark-affiliated employee proposed to use at least some of the $10 million payout to "complete the rebuild" of the Property in Baltimore and to settle "any claims by the remediation contractor" related to the same, (*see* ECF No. 37-13 at 1), Landmark insists that Landmark itself (as opposed to its parent) never actually received any money. (*See* ECF No. 43 at 3, 14; ECF No. 43-1 at 34.) Royal adduces no specific evidence to the contrary. As a result, even though Landmark does not deny it did not pass along insurance proceeds, (*see* ECF No. 43 at 3, 14; ECF No. 43-1 at 34–35), for purposes of summary judgment, it remains too uncertain whether Landmark ever received proceeds *to* pass along. Accordingly, Royal has not shown that Landmark breached its contractual duty vis-à-vis insurance.[6]

---

[6] The Court does not consider Royal's separate argument, not tied to either of the above theories, that Royal is entitled to summary judgment of $2.045 million—the amount Landmark's insurer's adjuster has purportedly "admitted" is owed to Royal. (*See* ECF No. 37-1 at 3, 6.) Royal offers no authority that this valuation in any way binds Landmark—something Landmark vociferously disputes, (*see* ECF No. 43 at 3–4)—or that, even if it did, such amount would still be due to Royal despite Landmark's affirmative defense of prior material breach, *see generally infra* Section III.B.

## B. Landmark Has Met Its Responsive Burden of Demonstrating that Genuine Issues for Trial Remain.

Royal's *prima facie* case notwithstanding, Landmark has shown that triable issues remain. In essence, despite agreeing with Royal on several critical facts and points of law,[7] Landmark argues Royal ultimately failed to uphold its own end of the bargain. (*See* ECF No. 43 at 3.) More particularly, Landmark asserts Royal violated the parties' agreement by invoicing amounts that were "fraudulent, or at best, a breach of the implied duty of good faith and fair dealing." (*Id.*) In Landmark's view, this breach by Royal excuses Landmark from further performance—namely, its duty to pay, through insurance or otherwise.[8] (*See id.*) Beyond providing a shield against Royal's claim, Landmark contends its Royal-breached-first defense also renders summary judgment inappropriate, as that defense turns on issues of fact—among them, whether Royal hewed to industry-standard protocol or else "churn[ed]" the bill by overcharging for both labor and materials. (*See id.* at 3–4.)

The Court is persuaded by Landmark's argument. Under Maryland law, one party's "duty to perform under a contract may be discharged by a [prior] material breach" by another party. *Waypoint Mgmt. Consulting, LLC v. Krone*, Civ. No. ELH-19-2988, 2022 WL 2528465, at *29 (D. Md. July 6, 2022) (internal quotation marks and citation omitted); *see also Chelsea Woods*, 2022 WL 2467257, at *16; *Traylor v. Grafton*, 332 A.2d 651, 674 (Md. 1975). A claim of excuse arising from prior material breach is to be treated as an affirmative defense. *Waypoint Mgmt.*, 2022 WL 2528465, at *29.

---

[7] Beyond not disputing that it neither paid Royal's invoices nor forwarded insurance proceeds, *see supra* Section III.A, Landmark appears to agree Royal had significant billing discretion by virtue of the time-and-materials nature of the contract, (*see id.* at 3; ECF No. 43-1 at 19–20, 22), and concedes that the bill it ultimately received was far lower than Royal's initial estimate—itself an amount to which Landmark did not object, (ECF No. 43-1 at 21).

[8] Landmark argues it should be excused in full, or if not, at least in part. (*See, e.g.*, ECF No. 43 at 14 ("To the extent [Royal] has first breached the contract . . . then [Landmark] is excused from performance, or at least until an accurate amount due and owing is produced.").) Landmark marshals no authority one way or the other, and because the issue is immaterial to the present Motion in any case, the Court makes no findings or determinations upon it.

13

In support of its affirmative defense of prior material breach, Landmark insists the bills it received were far too high for the work Royal should, or even could, have performed at the Property. In other words, it argues Royal's billing departed from industry standards to such a degree that Royal materially breached the agreement. (*See* ECF No. 43 at 14.) Ordinarily, materiality and compliance with industry standards are questions of fact. *See Barufaldi*, 7 A.3d at 656–57; *Lemma v. CalAtlantic Grp., Inc.*, 643 F. Supp. 3d 564, 573 (D. Md. 2022). And although not every discrepancy in anticipated cost amounts to a material breach, *see, e.g., Harford County v. Town of Bel Air*, 704 A.2d 421, 386–88 (Md. 1998), massive discrepancies might. *See, e.g., Fairchild Stratos Corp. v. Lear Siegler, Inc.*, 337 F.2d 785, 792–93 (4th Cir. 1964) (excusing, under Maryland law, one party's refusal to pay "until the correct charge for the services . . . could be determined"). By the same token, in cases where one party's performance is assessed against prevailing industry standards, a failure to meet those standards can likewise amount to a material breach. *Cf., e.g., Orion Drilling Co., LLC v. EQT Prod. Co.*, 826 F. App'x 204, 215 (3d Cir. 2020); *Jack Henry & Assocs., Inc. v. BSC, Inc.*, 487 F. App'x 246, 254–55 (6th Cir. 2012); *SCSI, LLC v. Kaco USA, Inc.*, Civ. No. 19-0035-KDB, 2020 WL 7625239, at *7 (W.D.N.C. Dec. 22, 2020). At least in theory, then, a trier of fact could find that Royal failed to follow industry standards, amounting to a prior material breach that excuses Landmark's nonpayment.

To that end, Landmark adduces evidence enough for a reasonable factfinder to conclude that Royal did not adhere to industry standards, and that this nonadherence materially breached the contract. Among other things, Landmark offers testimony that repeatedly identifies Royal's reliance on its own hygienist as falling outside industry norms. (*See, e.g.*, ECF No. 43-1 at 23–24, 28.) And while Landmark does not contest the specific rates at which it was charged, those having been set at the time of execution, (*see id.* at 22–23; ECF No. 37-3 at 10–27), it adduces testimony that many of Royal's charges were excessive and/or unnecessary, like those for after-hours labor,

14

hotel stays, non–portal-to-portal transportation, and skilled (as opposed to general) labor. (ECF No. 43-1 at 37–40.)

Landmark also points consistently to the large—nearly forty percent—delta between the amount of Royal's invoices, (ECF No. 37-8 (initial amount of $3.552 million); ECF No. 37-12 at 2 (revised amount of $3.383 million)), and the figure Landmark's insurer's adjuster deemed appropriate, (ECF No. 37-4 at ¶¶ 30–31 ($2.045 million)). (*See, e.g.*, ECF No. 43 at 3–4; ECF No. 43-1 at 21–30.) Viewing that gap in the light most favorable to Landmark, and with the benefit of further testimony on relevant industry standards, a reasonable factfinder could conclude that Royal's standards were outside industry norms, or even that its billing was fraudulent—in either case, a potentially material breach of the agreement.

Landmark introduces a putative expert report to similar effect. (*See generally* ECF No. 43-2.) That report states, *inter alia*, that "[t]he invoiced amount of $3.5 million by [Royal] for remediation services . . . is excessive in light of the scope of the work performed, work conditions, and size of the building/affected areas when compared with industry expectations," (*id.* at 4 (emphasis omitted)); that, given the project's emphasis on demolition, rather than more expensive drying and cleaning, "it becomes extremely difficult to understand how the overall project cost as claimed by [Royal] could have been in excess of $3.5MM dollars,"[9] (*id.* at 5–6); and that "an average daily cost for [Royal's] efforts equates to a staggering cost approximation of $165,000/day," which "does not align with industry expectations from a project standpoint for the scope and magnitude of [Royal's]/related efforts," (*id.* at 6 (emphasis and citation omitted)). The

---

[9] The putative expert's report appears to be based on Royal's first (unrevised) invoice, not the more recent (revised) invoice. (*Compare* ECF No. 43-2 at 6 (describing Royal's billing as "approximately $3.5 million"), *with* ECF No. 37-8 (initial invoice for approximately $3.552 million), *and* ECF No. 37-12 at 2 (revised invoice for approximately $3.383 million).) Still, the report estimates that "the actual costing as invoiced to Landmark by [Royal] for the relevant work may be on the order of 175% or more[] beyond what industry expectations would be for the [Royal] work." (ECF No. 43-2 at 4.) Given that both invoices fall well above the putative expert's estimate of "what industry expectations would be," the Court cannot conclude that a reasonable factfinder would not find the report's objections applicable to each.

report also emphasizes the parties' apparent disagreement about what, exactly, should have been done with blighted wall materials. In particular, it states that "substantial sections of the building (drywall) unaffected by flood water were observed marked for removal by [Royal] and/or [Royal's] subcontractors. . . . It is unknown how much building material and components were removed unnecessarily prior to any building inspection/analysis where this could have been observed by" Landmark. (ECF No. 43-2 at 7.) Although Royal is right that this does not necessarily mean Royal "either removed the drywall up to the level marked or charged for such work," (*see* ECF No. 44 at 3), taken in the light most favorable to Landmark, it underscores the ostensible distance between the parties as to the anticipated scope of Royal's work, and potentially as to industry-standard remediation protocol. Whether or not that distance manifested in the unnecessary removal of the drywall described in the report (or any materials, for that matter), it may have manifested in other ways—something Landmark is entitled to explore at trial.[10]

Collectively, this is enough to survive summary judgment. But it is a close call. Again, to survive summary judgment, the nonmoving party must produce more than a "scintilla of evidence" that triable issues remain. *Anderson*, 477 U.S. at 252. Yet most of Landmark's claims evoke something of a *res ipsa loquitur* theory of contract law—the idea that because material breach is the *only* plausible explanation for the invoiced amounts, no more specific explanation is needed. (*See, e.g.*, ECF No. 43-1 at 22–30 (Landmark's corporate designee repeatedly declining to identify specific instances of overbilling, instead pointing almost exclusively to the bottom line); ECF No. 43-2 at 4 (Landmark's putative expert stating that "detailed calculations and analyses of [Royal's] costs are beyond the scope of this letter," while estimating those costs to be "175% or more[]

---

[10] Landmark also observes that an earlier order of this Court provided that expert discovery would not occur until after the resolution of any dispositive motions. (*See* ECF No. 43 at 15 (citing ECF No. 13 at 2).) Because industry standards are at issue in this litigation, and because these are so often the proper subject of expert testimony, *see, e.g., Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997), Landmark is correct that it would be premature to resolve this dispute before the parties have had an opportunity to conduct expert discovery.

beyond what industry expectations would be").) Landmark offers no authority for this theory, and without more, it may not be enough to survive summary judgment over nonpayment on a time-and-materials contract.

Yet here, there is more. Beyond its *res ipsa*–like theory, Landmark adduces testimony that it was abnormal for Royal to hire and follow the protocol of its own hygienist, (*see* ECF No. 43-1 at 23–24, 28), testimony that at least some of Royal's specific charges were gratuitous, (*see id.* at 37–40), and evidence that Royal may have removed—or at least prepared to remove—materials that ought to have been left alone, and/or cleaned and dried materials that ought to have been removed, (*see* ECF No. 43-2 at 7–8; *see also* ECF No. 43 at 2). Taken together, there is reason enough for the Court to conclude a reasonable trier of fact could find that an affirmative defense exists. Landmark having met its burden, Royal's request for summary judgment will be denied.[11]

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny Royal's Motion for Partial Summary Judgment.

---

[11] The Court takes this opportunity to remind both parties that, in a summary judgment posture, a failure to buttress arguments with legal authority is no less problematic than a failure to introduce supporting facts. *See Schaefer v. Univ. Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and underdeveloped arguments are waived, as are arguments unsupported by legal authority."). It also violates the Local Rules of this District. *See* Local Rule 105.1 ("Any motion and opposition to a motion shall . . . be accompanied by a memorandum setting forth the reasoning *and authorities* in support of it . . . ." (emphasis added)). While the instant dispute does not present unique or novel legal issues, the Court nevertheless observes that, aside from the standard for summary judgment, the parties' briefs cite to virtually no relevant authority—Royal, to two cases concerning the interpretation of contractual language, (*see* ECF No. 37-1 at 5; *see generally* ECF Nos. 37-1, 44), and Landmark, to no cases or other authorities at all, (*see generally* ECF No. 43). In short, this style of briefing is unhelpful to the Court's speedy and accurate resolution of disputes, even in relatively well-trodden areas of the law.

DATED this 12 day of December, 2024.

BY THE COURT:

_/s/ James K. Bredar_
James K. Bredar
United States District Judge